IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

LINDSAY MOOREHEAD                                                           PLAINTIFF

v.                              No. 4:10-cv-546-DPM

HARDING UNIVERSITY, INC.;
HARDING UNIVERSITY; and
MICHAEL MURPHY, M.D.                                                      DEFENDANTS

ORDER

1. Lindsay Moorehead was one of twenty-six students in the second class of Harding University's Physician Assistant Program. She was enrolled from the summer of 2006 through the summer of 2007, one of only two African-Americans in her class. Moorehead filed this suit under 42 U.S.C. § 1981 after she was dismissed from the Program in June 2007. She claims that her race motivated her dismissal. The Harding Defendants say that Moorehead struggled academically from the outset, repeatedly failing to meet the Program's academic benchmarks. Harding University and Dr. Murphy, the PA Program Director, seek summary judgment.

Where genuine disputes of material fact exist in the record, the Court has viewed them in the light most favorable to Moorehead. *Scott v. Harris*, 550 U.S. 372, 380 (2007). But because "the record taken as a whole could not lead

a rational trier of fact to find for [Moorehead], there is no genuine issue for trial." *Ibid.* (quotation omitted). Moorehead has not shown that Harding University or its employees intended to discriminate against her based on her race. *Williams v. Lindenwood University*, 288 F.3d 349, 355 (8th Cir. 2002); *Gamble v. University of Minnesota*, 639 F.2d 452, 453 (8th Cir. 1981) (*per curiam*). Harding and Dr. Murphy are entitled to judgment as a matter of law.

2. Section 1981 prohibits discrimination in the "performance, modification, and termination of contracts" and protects Moorehead's enjoyment of the "benefits, privileges, terms, and conditions" of her contractual relationship with Harding. 42 U.S.C. § 1981. Because Moorehead's discrimination claim rests on inferences drawn from circumstantial evidence, the Court looks to the familiar burden-shifting framework to analyze her case. Moorehead makes a *prima facie* case by showing these things: (1) she is a member of a racial minority; (2) Harding University or its employees intended to discriminate against her on the basis of race; and (3) the discrimination concerned an area covered by the statute. *Williams*, 288 F.3d at 355.

Moorehead meets the first and third elements of this analysis: as a black student she had a contract with Harding, and her expulsion for allegedly discriminatory reasons is "tantamount to the termination of that contract[.]" *Williams*, 288 F.3d at 357. The fighting issue is discriminatory intent. Is there a jury question on whether race or academic performance prompted Harding to show Moorehead the door?

3. Moorehead began Harding's PA Program in the summer of 2006. She had problems from the start. For example, she failed and had to retake three exams — what the parties call "remediation" — in her first semester. She failed Clinical Medicine I and her GPA was below 2.5. Pursuant to Program policy, Moorehead was placed on academic probation. Moorehead's performance continued to lag during the fall 2006 semester. She failed and retook three more exams. Her cumulative GPA remained below 2.5.

In mid-November 2006, Moorehead's mother sent an email to Dr. Larry Long, then Vice President of Academic Affairs, raising concerns about Moorehead's treatment in the Program. Moorehead's mother made allegations of racial discrimination. Dr. Long forwarded the email to Dr. Thompson, Dean of the College of Sciences under which the PA Program

operated, telling him to look into the matter. Dr. Thompson did not do so. Dr. Murphy, Professor Tobin (a professor in the PA Program), and Peggy Huckeba (Academic Director of the PA Program) all stated, either by deposition testimony or sworn affidavit, that they did not know about Moorehead's mother's email until this lawsuit started.

A couple of weeks after the email, Moorehead and her classmates were allowed to review an exam they had recently taken. The class was warned several times, in various ways, not to copy the exam; Professor Tobin, who was supervising the review, instructed the students that they were allowed to note concepts for further study, but were not to copy exam questions and answers. After the review, Professor Tobin asked three students (Moorehead and two white women) for their notes. He suspected that these students had been writing down exam questions and answers. The three women produced their notes. Moorehead, however, was the only one that had copied specific exam questions and answers. She admits doing this. Professor Tobin discussed the issue with Dr. Murphy and Ms. Huckeba, and the trio met with Moorehead. Academic dishonesty was later added as a reason for Moorehead's probation. Moorehead unsuccessfully appealed that decision.

After the fall 2006 semester, the faculty academic advancement committee reviewed Moorehead's progress. Dr. Murphy then wrote Moorehead dismissing her from the Program because, under Program policy, a student with a cumulative GPA of less than 2.5 for two consecutive semesters was subject to dismissal. Moorehead challenged this dismissal. Harding reinstated her because Ms. Huckeba had incorrectly advised Moorehead about the Program's requirements.

In April 2007, all the first-year students were required to take a proficiency exam called the OSCE — a comprehensive test covering the entire first year of the Program. Moorehead had failed Clinical Medicine I, but Program policy mandated that all the first-year students take the exam. Moorehead was the only person in her class not to pass the exam.

Though nothing in the handbook required him to do so, Dr. Murphy gave Moorehead a second chance to pass the OSCE. She chose to retake the exam at the beginning of the summer semester rather than the end of the summer semester, which would have been after she had retaken Clinical Medicine I. Dr. Murphy gave Moorehead study materials, allowed her to review the OSCE she had failed, and tutored her. But despite being given

extra time to complete one of the problems on the second OSCE, Moorehead again failed the exam.

Moorehead had assumed that, because the first OSCE exam and the practice OSCE exams did not contain any cardiac questions, the second OSCE exam would not cover that subject area. Nobody told Moorehead not to study that subject area or that materials from Clinical Medicine I would not be on the exam. Dr. Murphy and Professor Tobin, though not required to do so, included a cardiac question on the second OSCE because Moorehead had done relatively well on several exams covering cardiac material.

Harding then dismissed Moorehead from the Program, pursuant to Program policy, because she twice failed the OSCE. She unsuccessfully appealed the decision.

4. Moorehead has not raised a triable issue of fact on the ultimate question in cases of this sort—whether Harding intentionally discriminated against Moorehead because of her race. *Williams*, 288 F.3d at 355. Harding and Dr. Murphy offered a mound of evidence showing that Moorehead's dismissal was for purely academic reasons; they addressed each of

Moorehead's allegations; in turn, she has not met their proof with proof. *Conseco Life Insurance Co. v. Williams*, 620 F.3d 902, 910 (8th Cir. 2010).

Even if Moorehead had made a *prima facie* case of discrimination, which the Court concludes she has not, the Court would still grant Harding and Dr. Murphy summary judgment. They provided legitimate, non-discriminatory reasons for dismissing Moorehead from the Program. Poor performance, not race, weighed in the balance. *See, e.g., Bell v. Ohio State University*, 351 F.3d 240, 254 (6th Cir. 2003). Moorehead offered no evidence to rebut these reasons or cast doubt on them. She therefore cannot prove that the reasons for her dismissal were merely pretextual.

5. Moorehead also claims that her dismissal was retaliation for her mother's email to Harding officials. Retaliation claims are analyzed under the same burden-shifting framework: "to establish a prima facie case of retaliation, [Moorehead] must show that (1) [s]he was engaged in a protected activity, (2) the institution was aware of that activity, (3) [s]he suffered an adverse action, and (4) there was a causal connection between the protected activity and the adverse action." *Shelton v. Trustees of Columbia University*, 369 F. App'x 200, 201 (2d Cir. 2010).

Here, assuming without deciding that Moorehead has established the first three elements of her *prima facie* case on retaliation, she has failed to establish the fourth. None of the Harding officials who decided to dismiss Moorehead from the Program knew about Moorehead's mother's email when they made their decision. Moorehead cannot establish the required causal connection between the email and her dismissal. Dr. Murphy, Professor Tobin, and Ms. Huckeba simply could not have acted in retaliation for an email unknown to them.

\* \* \*

Defendants' motion for summary judgment, *Document No. 44*, granted. Moorehead's complaint, *Document No. 26*, is dismissed with prejudice.

So Ordered.

*[signature]*
D.P. Marshall Jr.
United States District Court

17 May 2012